THE UDALL MILLING COMPANY, *a Partnership, etc., Appellees,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

No. 16,454.

SYLLABUS BY THE COURT.

1. RAILROADS—*Delay in Furnishing Cars Applied for—Penalties —Limitation of Actions.* The reciprocal demurrage act, among other things, provides that when a shipper applies to a railway company for cars they must be furnished within a specified time, and that if the railway company fails to furnish them within that time it shall forfeit $1 per day for each car it fails to furnish. *Held:* (1) In an action brought to re-

cover penalties under that act, the one-year statute of limitations applies. (2) For each day of neglect after the prescribed time a penalty of $1 per car was at once incurred, on which the statute of limitations began to run. Each penalty was a distinct liability, and when the statute was set in motion on such a liability it continued to run until the action was commenced or barred. (3) The subsequent furnishing by the railway company of the cars demanded stopped the accumulation of penalties, but did not. arrest the running of the statute as to penalties already incurred.

2. —————— *Duty to Provide Equipment and Cars—Noncompliance with Statute Excused by Unavoidable Accident.* It is the duty of a railway company to provide such equipment and cars as will meet not only the ordinary and usual requirements of the traffic but also provide for such increase of business and demands for cars as can reasonably be anticipated. If, however, there is a rush of business or a congestion of traffic which could not reasonably have been anticipated, and there is a delay arising from circumstances beyond the control of the railway company, it will be deemed to be abnormal and such an unavoidable accident as will excuse noncompliance with the demand for cars and relieve the company from the penalties provided for in the act.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed April 9, 1910. Reversed.

## STATEMENT.

THIS action was brought to recover amounts alleged to have been forfeited by the failure of the railway company to furnish cars demanded by the Udall Milling Company for the shipping of freight between Udall and other points in Kansas. In their petition the milling company alleged that they had made eight different applications for cars, which the railway company did not furnish. Based on these refusals, they set forth eight counts in their petition. A demurrer was sustained as to the first, second, seventh and eighth counts, and the case went to trial upon the third, fourth, fifth and sixth counts. In the third count, among other things, it was alleged that on December 29, 1906, a written demand was made for three box cars, each of

17—82 KAN.

60,000 pounds capacity, for immediate delivery at Udall, to be loaded with grain for Winfield, and that plaintiffs paid the railway company $22.50, being one-fourth of the freight charged for the cars ordered, and the agent of the company gave them a receipt for that amount stating the purpose for which the receipt was given. It was then alleged that no cars were delivered under the order until February 7, 1907, being a delay of thirty-six days. At that time one car was delivered, another was delivered on the following day, and the third on February 20, 1907, being a delay of forty-nine days on the last car. It was alleged that by reason of these refusals and delay there was a forfeiture of $121, for which judgment was asked. The remaining three counts were similar to the third, except as to the time of demand for cars and the extent of the delay in furnishing them. In addition to a general denial, and a plea that the third cause of action was barred by the statute of limitations, the railway company alleged:

"That at the various times alleged there was a great congestion and increase of traffic on the line of defendant's railroad which was not and could not reasonably have been anticipated on the part of the defendant. By reason of such increase and congestion of traffic at the times alleged in the petition, it became impossible and impracticable for the defendant to furnish cars and equipment in sufficient number to handle with promptness all the traffic offered to it. The defendant railway company operates many thousand miles of railroad in this and other states, and that the increase and congestion of traffic aforesaid was general over the entire system of railroad operated by defendant. Said increase and congestion of traffic were not confined to the railway system operated by the defendant, but that such condition applied generally to the railroads of the United States, and that by reason thereof it was, at the time alleged in said petition, impossible for defendant to procure cars and engines from other railroad companies, by means whereof it might provide for the traffic on its own line, and that by reason of such increase and congestion of traffic, when cars for through shipments were turned over to other railroads, it be-

came and was impossible for the defendant to secure a prompt return of the cars and equipment to its own line so as to furnish a prompt service to its own patrons. That long prior to the times alleged in the petition of the plaintiffs, and up to and including said times, the defendant company had sought to secure the purchase and building of cars and equipment, so as to meet every possible requirement, from the various companies engaged in the manufacture and sale of cars and equipment, but that owing to the general increase in traffic and the general demand for cars and equipment it became impossible for it to secure from such companies engaged in the manufacture and sale of cars a sufficient supply of such cars and equipment to meet the full requirements of its traffic. That in so far as it was able, having due regard for the requirements of shippers on other parts of its line and system, defendant furnished plaintiffs and all other shippers their due and proportionate share of cars and equipment. The aforesaid increase and congestion of traffic were due in part to unprecedented crops and to an unusual and unforeseen increase in manufactures and in mining which defendant could not have reasonably anticipated. Prior and up to the time of the aforesaid increase and congestion of traffic, defendant had sufficient cars and equipment to meet the ordinary and usual requirements of its business."

There were averments, too, that under the laws of the United States and of the state the railway company is not permitted to discriminate between shippers, and to have furnished the cars upon the demand of the milling company would have resulted in a discrimination against other patrons of the road. It was also alleged that the reciprocal demurrage act, under which the applications were made, violates the laws and the constitution of the United States so far as it relates to interstate shipments. A trial was had, in which evidence tending to support the allegations of the petition was given. A demurrer to the evidence of the milling company was overruled. The railway company then introduced testimony tending to support the allegations which it had made by way of excusing it from furnish-

ing the cars demanded, and to show that conditions existed which made the provisions of the reciprocal demurrage act inapplicable to the case. The verdict and judgment were in favor of the milling company, and the railway company has appealed.

*William R. Smith, O. J. Wood,* and *Alfred A. Scott,* for the appellant.

*A. M. Jackson,* and *A. L. Noble,* for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: The first question arising on the appeal is whether the third cause of action stated in the petition was barred by the statute of limitations. It arises under the reciprocal demurrage act, which provides that if the application of the shipper be for ten cars or less the railway company must furnish them within three days from the time of demand, and that a railway company failing to furnish them within that time shall forfeit $1 per day for each car it fails to furnish. (Laws 1905, ch. 345; Gen. Stat. 1909, § 7200 *et seq.*) In this case the application for cars was made on December 29, 1906, and hence on January 2, 1907, the railway company was in default. As the liability was a forfeiture imposed by statute, the one-year limitation provided for in subdivision 4 of section 17 of the civil code applies. (*Joyce v. Means,* 41 Kan. 234; *Beadle v. K. C. Ft. S. & M. Rld. Co.,* 48 Kan. 379; *Wey v. Schofield,* 53 Kan. 248.) For the first day of neglect to furnish cars, beginning January 2, 1907, the railway company became liable for a penalty of a dollar on each car, and for every successive day thereafter new penalties were incurred. Each was a distinct liability, on which the statute of limitations began to run at the time it was incurred. As was said in *Colo. Fuel & Iron Co. v. Lenhart,* 6 Colo. App. 511, 515, "when the liability to the penalty is incurred, the creditor's cause of action for its recovery accrues; and the statute is set in motion, and does not stop until the

action is commenced or barred." (See, also, *The Rector, etc., of Trin. Ch. v. Vanderbilt,* 98 N. Y. 170; *Wells v. Cooper,* 57 Conn. 52; *Atwood v. Lockwood,* 76 Conn. 555; *Patterson v. Wade,* 115 Fed. 770; *State Savings Bank v. Johnson,* 18 Mont. 440; *Town of Londonderry v. Arnold,* 30 Vt. 401; *Hazelton v. Porter,* 17 Colo. App. 1.) The bar had fallen on most of the penalties involved in the third count when the action was commenced, but as to the penalties which had accrued within one year prior to the commencement of the action, of course, a recovery may be had. It is suggested that the ultimate furnishing of the cars by the company in some way tolled the statute. The recognition of the demand for cars or an acknowledgment that compliance with the demand was a duty unperformed did not affect the liabilities already incurred nor arrest the statute of limitations as to them. A written acknowledgment of an existing liability founded on contract will operate to toll the statute, but no such provision is made as to torts or penalties arising from the violation of statutes. The furnishing of the cars stopped the accumulation of new penalties but it did not arrest the running of the statute of limitations on the penalties incurred. It is argued that if a cause of action is deemed to have accrued at the end of each day, that would necessitate a multiplicity of suits growing out of the same transaction, and that therefore all of the violations should be regarded as constituting one comprehensive cause of action. The same point was made in *Wells v. Cooper,* supra, where an action was brought to recover penalties which accrued every month by an officer's neglect to file a certificate in the town clerk's office. It was held that each month's neglect was a complete offense in itself, and that all that were more than one year old were barred by the statute of limitations. It was there contended that the aggregated forfeitures might well be regarded as one and all included in one cause of action. The court responded by saying:

"While we concede the right to recover all the sep-

arate forfeitures as one sum, yet we must regard the separate forfeiture for each month's neglect as standing by itself in contemplation of the statute, and as cut off by it where one year has elapsed before the bringing of the suit. In order to determine conclusively when the statute begins to run we have only to determine when a suit for the recovery of any forfeiture might be first brought. There can not be any doubt that a suit might be brought at the end of the first month's neglect, and repeated at the end of each subsequent month's neglect. The purpose and efficiency of the statute would be entirely destroyed if this were otherwise." (Page 56.)

Whether or not the penalties may be set up in one count of a petition does not in any way affect the running of the statute of limitations as to those penalties incurred from day to day because of the continued neglect of the railway company. Nor will the furnishing of the cars after the liability has arisen arrest the running of the statute.

The question remains, Did the facts pleaded by the railway company and in support of which it offered testimony except the case from the operation of the reciprocal demurrage statute? It declares "that the provisions of this law shall not apply in cases of strikes, unavoidable accidents, or other public calamity." (Laws 1905, ch. 345, § 10.) The jury were instructed that "in the judgment of the court it has been neither pleaded nor proved in this case that any failure to furnish cars was the result of either strikes, unavoidable accidents, or other public calamity." This was a practical determination of the case in favor of plaintiffs. In the abstract it is stated that there is testimony tending to sustain the allegations of the answer, and in deciding whether there was error in the instructions we need only inquire whether the facts pleaded by the railway company constitute any defense to the plaintiffs' action. Are any of the causes alleged by the railway company for its failure to provide the cars demanded valid or sufficient? The statute was interpreted to

some extent in *Patterson v. Railway Co.*, 77 Kan. 236. The contention there was that the regulations of the statute were so unreasonable and drastic as to transcend the regulating power of the legislature. It was conceded to be competent for the legislature to make regulations requiring railway companies promptly to provide facilities for the speedy transportation of property or persons, but it was held that to be within the police power of the state these regulations must be reasonable. It was recognized that if the statute made absolute requirements with which the carrier could not comply, or which were unreasonable and oppressive, it could not be sustained. To uphold the statute a liberal view was taken of the provision that the carrier should not be liable to penalties for strikes, unavoidable accidents or other public calamities. A Texas statute, from which ours appears to have been taken, provided that the only excuses for failure to furnish cars on demand were strikes or other public calamities. The enforcement of that statute came before the supreme court of the United States, and that court, in holding the statute to be invalid, said:

"An absolute requirement that a railroad shall furnish a certain number of cars at a specified day, regardless of every other consideration except strikes and other public calamities, transcends the police power of the state and amounts to a burden upon interstate commerce." (*Houston & Tex. Cent. Railroad v. Mayes*, 201 U. S. 321, 329.)

To meet just such a contention our legislature broadened the exception and enlarged the excuses for delay or noncompliance with the demands for cars. It added the excuse of "unavoidable accident," and this term was held to include an undesigned contingency—an abnormal or phenomenal happening—something against which the railway company could not be expected to provide or something causing a delay which a company could not well avoid. So interpreted, the statute was upheld, and but for that view the court must have

followed the decision in *Houston & Tex. Cent. Railroad v. Mayes, supra.* Referring to the allegations of the answer, the excuses alleged are in effect that there were unprecedented crops in the state and an unexpected increase in the products of the factories and mines, and that there was a congestion of traffic which made it impossible and impracticable for the company promptly to meet the demands for cars. This increase and congestion, it is said, affected other lines in this and other states, so that it was impossible to obtain cars or equipment from other railway companies, and impossible for defendant to procure a return of its own cars which were transported beyond its own line. Now, a large crop is not unusual or phenomenal in Kansas, and hence that may not be a very good excuse. Nor is it easy to understand why the larger products of the mines and factories might not reasonably have been foreseen. It is alleged, however, that the congestion of business was not limited to its own line, but that it was of a character that made it impossible to obtain cars from other sources or to secure a return of its own cars which had gone beyond its own lines. In addition, the company alleged that long prior to that time it had "sought to secure the purchase and building of cars and equipment, so as to meet every possible requirement, from the various companies engaged in the manufacture and sale of cars and equipment, but that owing to the general increase in traffic and the general demand for cars and equipment it became impossible for it to secure from such companies engaged in the manufacture and sale of cars a sufficient supply of such cars and equipment to meet the full requirements of its traffic." In other portions of the answer it is alleged that the company had on hand sufficient cars and equipment to meet the ordinary and usual requirements of its business. Now, if that precaution had been taken and there was a rush and congestion of business which could not reasonably have been anticipated, and it was

impossible to borrow or buy cars from any source, it. would appear that there was a good excuse for non-compliance with the demands.    In *Houston & Tex. Cent. Railroad v. Mayes*, 201 U. S. 321, it was said of the Texas statute:

"It makes no exception in cases of a sudden congestion of traffic, an actual inability to furnish cars by reason of their temporary and unavoidable detention in other states, or in other places within the same state. It makes no allowance for interference of traffic occasioned by wrecks or other accidents upon the same or other roads, involving a detention of traffic, the breaking of bridges, accidental fires, washouts, or other unavoidable consequences of heavy weather."    (Page 329.)

These things were mentioned as circumstances wholly beyond the control of the company and it was said that an arbitrary infliction of a penalty for an unavoidable delay was unreasonable.    It was further remarked:

"While railroad companies may be bound to furnish sufficient cars for their usual and ordinary traffic, cases will inevitably arise where, by reason of an unexpected turn in the market, a great public gathering, or an unforeseen rush of travel, a pressure upon the road for transportation facilities may arise, which good management and a desire to fulfill all its legal requirements can not provide for, and against which the statute in question makes no allowance."    (*Houston & Tex. Cent. Railroad v. Mayes,* 201 U. S. 321, 331.)

It is the duty of a railway company to provide such equipment and cars as will meet not only the ordinary and usual requirements of the traffic but also such increase of traffic and demand for cars as can be reasonably anticipated.    If, however, there is a rush of business or a congestion of traffic which could not reasonably have been foreseen, and a delay arises from circumstances wholly beyond the control of the company, it should be regarded as abnormal and such an unavoidable accident as will relieve the company from the

penalties of the act. The averments of the answer, although somewhat general, set up a sufficient excuse and stated a defense under the statute, and the holding of the court to the contrary was material error.

The judgment is therefore reversed and the cause remanded for a new trial.